Filed 10/30/20

CERTIFIED FOR PARTIAL PUBLICATION*


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D077038 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN404827) |
| CODY ASHTON KRUSE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Blaine K. Bowman, Judge. Affirmed.

Kenneth J. Vandevelde, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos, and Kathryn Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

---

\* Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of part I.

A jury convicted Cody Ashton Kruse of making a criminal threat (Pen. Code,[1] § 422) (count 1), attempting to deter or prevent an executive officer from lawful performance of his duties by means of violence or threat of violence (§ 69) (count 2), and possession of a controlled substance (Health & Saf. Code, § 11377, subd. (a)) (count 3). The trial court sentenced Kruse to three years and eight months in state prison, consisting of the upper term of three years on count 1, the upper term of three years on count 2 to run concurrently with the term for count 1, credit for time served on count 3 concurrent with the time imposed on counts 1 and 2, and a consecutive eight-month term on a separate probation revocation case.

Kruse contends the trial court prejudicially erred by (1) allowing the prosecutor to question him on cross-examination about being investigated for killing his former girlfriend's baby, and (2) refusing to instruct the jury on section 148, subdivision (a)(1) (willfully resisting, delaying or obstructing a public officer) as a lesser included offense of section 69 (attempting to deter an executive officer from performing any duty by means of threat or violence). We affirm.

FACTS

On the evening of September 11, 2019, Samantha Howell and her friend Clever went to the apartment of Howell's friend Heather Koetter for dinner. Koetter's apartment was a small, one-bedroom, second story apartment in Escondido. Koetter's daughter, who was then seven years old, sometimes lived with Koetter in the apartment and was there with Koetter when Howell and Clever arrived at around 7:15 p.m. Kruse and his friend

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

Boxer arrived at the apartment around 30 minutes later. Kruse and Koetter had been dating for a couple of months.

About an hour after everyone arrived, Koetter and Kruse got into an argument about another woman Kruse had been talking to and exchanging text messages with and about Koetter's refusal to let Kruse use her car to give Boxer a ride home. During the argument Koetter asked Kruse to leave the apartment and he left with Boxer.

About 20 minutes later, Kruse returned to the apartment to retrieve his cell phone and backpack. The front door was locked and Koetter did not want to let Kruse back into the apartment. She slid his cell phone under the door but initially did not want to give him his backpack. Kruse looked into the apartment through a window and told Koetter that he just wanted his "stuff." He knocked on the door and the living room window and called out Howell's name. Howell told Koetter, "Heather, just give him his stuff. We'll get it over with. We'll give it back to him. We'll be done with it."

A minute or two later, Koetter decided to give Kruse his backpack. When she opened the door to hand it to him, he shoved his way inside the apartment and sat on the couch. Koetter was upset. She yelled and screamed at Kruse and told him he had to leave, and she grabbed his hands and tried to pull him off of the couch.

Howell went in and out of the apartment during the fight. At one point she entered the apartment and saw Koetter on top of Kruse with her hands around his neck, squeezing him and telling him he needed to "get the fuck out." Kruse remained on the couch and laughed. He said to Koetter, "I'm not going anywhere. I'm not leaving." When Koetter was choking Kruse, Howell tried to pull her off of him because she saw that his face was turning red.

3

Howell repeatedly asked Kruse to leave but he told her he was not going anywhere or ignored her.

An hour or more after Kruse returned to the apartment and refused to leave, Howell entered the apartment and became upset when she discovered Kruse had locked himself in the bedroom where Koetter's daughter was sleeping. Koetter was banging on the bedroom door and demanding that Kruse open the door. Howell also banged on the door and then went to the bedroom window outside the apartment and attempted to pull off the screen. A neighbor standing outside the apartment told Howell to stop because Kruse had come out of the bedroom.

Howell testified that she went back inside the apartment and walked up to Kruse. She called him a little bitch, asked him how he dared lock himself in a little girl's bedroom, and told him to get out and leave. Kruse looked at Howell and told her that he was going to put a bullet through her brain and kill her. Kruse sounded angry and upset and was standing "almost nose to nose with [Howell] looking [her] in the eyes" when he made the threat. Howell responded to the threat by saying, "Then do it." She was upset but she responded that way because she did not want to feel like Kruse "was empowered over [her.]" Kruse's threat scared her because she did not know why he refused to leave the apartment, he was bigger than her, she knew he had a criminal record, and he had said earlier that evening that he had a trial going on in a murder case.

After Kruse threatened to kill Howell, she left the apartment and went downstairs, where she called some friends and asked them what she should do. She told neighbors who were standing there that Kruse had threatened her life. She did not call the police, but a neighbor said the police should be

4

called. One of the neighbors, Tremell Foster, handed his cell phone to another neighbor, who used it to call 911.

About five or ten minutes after the 911 call was made, Escondido police officers arrived at the scene. Officers entered the apartment where Kruse and Koetter were still fighting and questioned them about what happened. The police arrested Koetter for misdemeanor domestic violence (battery) against Kruse. Officers handcuffed Kruse and detained him outside the apartment where he continuously yelled and screamed at the officers and was uncooperative. At one point he bragged about getting six months in jail for committing a murder. After Koetter was arrested, the police determined Kruse was not a suspect in their crime investigation and released him from the scene. They gave him his backpack and told him to leave.

When Howell saw that officers were arresting Koetter and releasing Kruse, she walked up to Kruse while he was talking to an officer and confronted him. The exchange between them was recorded on a police body-worn camera video that was played for the jury. Howell said to Kruse, "This is all your fault." Kruse responded, "If it was my fault . . . why would I be getting let go, bro? . . . [I] have a murder case and everything and I'm getting let go. Come on now. . . ." Howell replied, "You're the one who threatened to put a bullet in my brain, you know? You're the one who threatened us."

An officer who overheard the conversation asked Howell when Kruse threatened her and she told him that he threatened her "right when [he and Koetter] started fighting." Another officer at the scene then interviewed Howell about Kruse's threat. Howell told the officer that Kruse said to her, "Fuck you. I'm going to put a bullet in your . . . brain." Howell said the threat made her immediately fear for her safety and leave the apartment, and that she was afraid of Kruse because he told her he was involved in a

5

murder case, and she believed that he hung out with people who had guns and that he might have guns and could readily carry out his threat. The officer who interviewed Howell determined there was probable cause to arrest Kruse for making the threat. Officer Danny Armenta caught up with Kruse as he was walking away from the apartment building and detained him.

Armenta asked Kruse for permission to search his backpack and Kruse consented. Armenta found a small white plastic bindle containing methamphetamine in a zipper pocket on the right shoulder strap of the backpack. Another officer had searched Kruse's backpack earlier but did not find the methamphetamine. Armenta arrested Kruse for possession of a controlled substance and making a criminal threat. He handcuffed Kruse and placed him in the back of his patrol car to transport him to the police station for processing.

On the way to the police station, Kruse was very agitated and uncooperative. He shouted and yelled at Armenta angrily and stepped on his seat belt to prevent Armenta from fastening it. After Armenta managed to buckle Kruse's seat belt, Kruse was able to reach around and unbuckle it. When they arrived at the police station and stopped in the sallyport, a secured area where officers can remove arrestees from their police vehicles, Kruse made comments to Armenta that Armenta viewed as threats toward him.

The jury viewed a body-worn camera video of Kruse's exchange with Armenta in the sallyport. Kruse said to Armenta, "Please tell me you're going to try to get me out of the holding cell. . . . Oh, my God. This shit going to be funny as hell. I'm 6 and 0 in the fucking ring. Let's please do this shit." Armenta called for backup officers because he thought that Kruse was

6

threatening him and that there would be a physical fight if he opened the back door to his patrol car to get Kruse out of the back seat. He interpreted Kruse's "6 and 0" reference to mean that Kruse had six wins in the fights he had been in, and he believed Kruse was using the comment as a way to threaten him with physical violence. He interpreted Kruse's saying "Let's do this" to mean Kruse was preparing for a fight and wanted Armenta to physically fight him. Kruse was still agitated and angry and was shouting throughout the entire conversation.

Armenta asked Kruse, "Are you . . . threatening us or what?" Kruse responded, "I ain't threatening shit, boy." Armenta asked Kruse about his "6 and 0 in the ring" comment and Kruse said, "You got hands–if you got hands, ain't no threat. Run 'em. Ain't no threat, B. Run 'em. Oh, no. Shit, I ain't never been knocked down." He added, "Please let's go, bro." Armenta testified that when Kruse stated "if you got hands, ain't no threat," Armenta believed "he was saying if [Armenta] had the skills. It wasn't a threat. He was ready to fight [Armenta]." Armenta interpreted Kruse's saying that he had never been knocked down to mean that in Kruse's past fights, he had never been knocked down or had never lost; Kruse believed he was superior.

After Kruse stated that he wanted the officers to "test that meth" and made comments implying that the methamphetamine found in his backpack was planted, Armenta asked Kruse, "Are you going to fight me if I get you out of that door?" Kruse responded, "I'm not going to fight you. Ain't no fight, was it? That shit wouldn't be fair. Come on, now. Please. Hands behind my back. Please." Armenta testified that he believed that in making those comments, Kruse was saying "it wasn't a threat"–i.e., the fight would not be fair–because he (Kruse) would win.

7

When two backup officers arrived, Armenta opened the back door of his police vehicle.  Kruse initially refused to come out.  Armenta testified that Kruse's threats delayed him in the performance of his duty to bring Kruse into a holding cell, where Kruse would be held while Armenta processed paperwork before Kruse was booked into the Vista Detention Facility.  Kruse eventually was removed from the vehicle without incident and taken to a holding cell.

At around 3:35 a.m. Armenta was ready to transport Kruse to the jail in Vista.  Kruse was lying on a bench in the holding cell.  Armenta tapped on the holding cell window and told Kruse it was time to get up, but Kruse did not respond.  Armenta called for another officer to assist him because he thought that Kruse might be faking being asleep and, based on Kruse's prior threats of violence, that there might be a physical fight if he went into Kruse's cell alone.  Two officers arrived to assist Armenta.  Armenta testified that when the other officers arrived at the scene, Kruse suddenly stood up, took his shirt off, and walked to the back of the jail cell.  He balled his fists, puffed out his chest, and flexed his "lats" to make himself look bigger.

The jury viewed a body-worn camera video that showed Kruse's actions and statements in the holding cell.  Armenta told Kruse he "tested the meth [and] it came out positive."  Kruse did not respond. Armenta asked him to get up and Kruse said, "Nah, bro."  Armenta asked Kruse to put his hands behind his back and Kruse responded, "Nope, let's go."  Armenta said, "All right, so you're gonna fight us, is that what you want to do?"  Kruse responded, "Go, let's go."  Armenta said, "You want to do that?"  Kruse responded, "Let's go."  Armenta told Kruse, "I don't want to fight you."  Kruse said, "Run it nigga.  Run it."  Armenta stated, "You, you want to fight us."  Kruse responded, "Yup."  He then stated, "Positive test, let's run it then."

8

Armenta repeated to Kruse that he did not want to fight him. Kruse repeated, "Run it then." Armenta said, "Okay[,]" and Kruse said, "Pop the door, bro. Pop the door." Armenta said, "No, you gotta, you gotta get on the ground." Kruse responded, "Let's go." Armenta told Kruse two more times to get on the ground and Kruse refused. Kruse accused the officers of planting the methamphetamine found in his backpack and continued to argue with them and refuse to comply with their requests to get on the ground. Eventually, Armenta used pepper spray on Kruse and removed him from the holding cell. Armenta then transported Kruse to the Vista Detention Facility. Kruse was extremely angry the entire ride. He continuously kicked the car doors and stomped on the floorboards.

Armenta testified that Kruse's demeanor inside the holding cell was angry, very agitated, confrontational, and combative. His challenging Armenta to a fight deterred Armenta from performing his duty to place Kruse in handcuffs and transport him to the Vista Detention Facility for booking.

Kruse testified at trial that when he returned to Koetter's apartment on the night of the dinner party to get his cell phone and backpack, Koetter gave him the phone but would not let him come inside to get his backpack. He knocked on the window and asked Howell to give him his backpack, and Howell asked Koetter to give him the backpack so he could leave. Koetter eventually opened the door and gave Kruse his backpack. They were talking at the door and Kruse walked into the apartment. He did not shove his way in. Kruse testified that he did not leave the apartment because Koetter was sad and he did not want to leave her feeling sad and that he did not care for her.

Kruse later testified that when he was standing at the doorway talking to Koetter, Koetter and Howell both hit him and started to push him out the

9

door. He explained that he was standing at the doorway "probably just a foot inside," and Koetter was standing at the door yelling at him and calling him a liar. Howell was pacing in the background. When Koetter started hitting him, Howell walked up and hit him too, and they both tried to push him out the door. Howell hit him in the face with a closed fist. Kruse did not hit either Koetter or Howell. Koetter's neighbor Tremell Foster appeared outside the door and got in between Kruse and the women, stating that he was not going to let them beat up his friend. Kruse then went inside and sat on the couch. Foster told Kruse that he (Kruse) should go, but Kruse stayed because he wanted to talk to Koetter and "clear things up with her."

Kruse testified that when he sat on the couch, Koetter started hitting him repeatedly in the face as he asked her to calm down and talk to him. At one point she grabbed her hand in pain from hitting him. Kruse got off the couch, went to the freezer, got an ice pack, and put it on her hand. Koetter was starting to calm down until the neighbor who called the police opened the door and suggested that Kruse leave immediately to avoid getting arrested. Koetter then hit Kruse with the ice pack and started choking him. When Howell pulled Koetter off of Kruse, Kruse went into the bedroom and locked the door.

Kruse testified that he went into the bedroom "to diffuse the situation" and let Howell talk to Koetter, and to make sure Koetter's daughter was all right. He stayed in the bedroom about five or six minutes and opened the door when Foster knocked on it. When he came out, he went into the bathroom and Koetter followed him. Kruse sat on the closed toilet with his head in his hands as Koetter stood next to him yelling and crying. Kruse denied that he ever told Howell he was going to put a bullet in her brain and kill her or that he otherwise threatened her. When asked about his reference

to a murder case that evening, Kruse testified that he was talking to his friend Boxer about a 2013 case where they could have been tried for attempted murder but were not, and Howell may have overheard that conversation.

Kruse testified that he did not put any methamphetamine in the strap of his backpack the night of the incident and was unaware there was any methamphetamine in his backpack. He thought the officers might have planted the methamphetamine.

Kruse testified that he did not threaten Officer Armenta at the police station sallyport and he did not want to fight Armenta. He intended to communicate to Armenta that a fight would not be fair because his (Kruse's) hands were behind his back. When Armenta woke up Kruse in the holding cell, Kruse heard him say that force was going to be used against him, so Kruse took off his shirt and walked to the back of the cell to brace himself against the use of force. He took his shirt off because he had been sleeping with his arms inside the shirt to stay warm in the cold cell, and taking the shirt off was the easiest way to put it back on. He did not remove his shirt to threaten Armenta.

When he said "Let's go" to Armenta, he meant that he was ready to be transported. He testified that when Armenta asked if he wanted to fight the officers he answered "Yup" because he was not really hearing Armenta and "was just yelling things back" and "answering questions that [Armenta] had asked prior." Armenta asked multiple questions and Kruse "was saying yep to some, no to others, and [he] wasn't really hearing each question individually." He could not hear well because the holding cell had an echo and he and Armenta were yelling at each other.

11

DISCUSSION

I. *Cross-Examination of Kruse About Having Been Investigated for Killing His Girlfriend's Baby*

Kruse contends the court prejudicially erred by allowing the People to ask Kruse on cross-examination about having been investigated for killing his girlfriend's baby. We conclude the court abused its discretion in allowing the prosecutor to ask Kruse whether he had been investigated for killing a baby, but the error was not prejudicial–i.e., it is not reasonably probable that Kruse would have obtained a more favorable outcome if the prosecutor had asked him about a prior homicide investigation without mentioning that it involved a baby.

*Background*

At trial, outside the presence of the jury, the prosecutor told the court that she wanted to offer the testimony of Escondido police officer Armenta that on the night of the incident, Kruse "bragged" to officers on the scene that he "got six months for killing a child." Defense counsel argued the evidence should be excluded under Evidence Code section 352 because it was irrelevant as to Armenta; it was highly prejudicial because it involved a child and would inflame the jury; and it was cumulative to the extent it had already been brought up during threat victim Samantha Howell's testimony.

The court ruled that "under [Evidence Code section] 352," it would allow Armenta to testify that Kruse told the officers about his murder charge. However, the court observed that "the fact that it involved a baby could be overly prejudicial, whether it's the murder of a baby or another person, it doesn't really matter." Accordingly, the court ordered that "the fact that [Kruse] mentioned that it was a baby not be mentioned." Armenta later testified that "[a]t one point [Kruse] was bragging about how he got six

12

months in jail for murder." He did not mention that Kruse had referred to "killing a child."

When the court and counsel were later discussing jury instructions outside the presence of the jury, defense counsel asked the court to sanitize the evidence that Kruse bragged about committing a murder. Counsel first asked the court to either take judicial notice that there is no murder case pending and that Kruse had no prior convictions for murder or have an investigator from her office testify to those facts. Alternatively, counsel asked the court to instruct the jury as follows: "[Y]ou heard evidence that Mr. Kruse told some of the witnesses that he only got six months for murder. You are not to speculate about any other case not before you or whether such a case actually exists. You are only to consider this evidence for the limited purpose of determining how this statement affected Ms. Howell." The prosecutor was not opposed to that instruction.

When Kruse testified at trial, the prosecutor asked him on cross-examination to acknowledge that he told an officer on the scene that he "did six months for committing a murder." Kruse responded, "Incorrect, miss." When asked if he was saying the officer was lying, Kruse stated, "I'm not saying he was lying. I'm saying that the information that he gathered could have been incorrect." During a break, the prosecutor asked the court to allow her to impeach Kruse's credibility by showing the jury the body-worn camera video in which Kruse told an officer on the scene that he got six months for killing a child. The court allowed the prosecutor to play the video with the word "child" deleted.

The prosecutor played the video clip, which contained the following dialogue:

"KRUSE: Come on now. I've been flash banged before. I was there when you guys did that. Didn't even stutter . . . ran right after it. Come on now.

"OFFICER: Is that for the, uh, for the murder? When they flash banged . . .

"KRUSE: Yup.

"OFFICER: (Unintelligible)?

"KRUSE: Yeah, it was for the murder, which I got six months for."

On redirect examination, Kruse's counsel asked Kruse questions related to the video. Kruse testified that he was not currently on trial for murder, did not have an open case for murder, and had never pled guilty to murder or attempted murder. Counsel asked him to explain what led up to the conversation shown in the video. Kruse explained that he and some friends in an apartment had been "flash banged" by SWAT officers in 2013 and arrested, but not charged, with attempted murder. He explained that "flash bang" referred to "a diversionary tactical grenade or aka flash bang grenade," which the officers "deployed . . . on us to frazzle us I guess."

Kruse then gave testimony that indicated his reference to getting six months for murder related to the 2013 case involving the flash bang grenade. He testified that he told an officer that he "got six months for something you guys tried to make that wasn't even it at all." He said he was not bragging about getting only six months for murder and was never charged with murder in the 2013 case, although one of his accomplices was "booked under attempted murder."

Before the prosecutor began her re-cross examination she asked the court for a sidebar. The court asked the prosecutor, "Are you going to go into the area that was brought up on redirect?" The prosecutor answered

14

affirmatively and the court stated, "You don't need to approach sidebar. You can go ahead and inquire." The prosecutor said, "I think–" and the court interrupted her and asked, "Are you going to ask about the murder charges?" The prosecutor answered, "Yes, Your Honor." The court stated, "All right. It was brought up on redirect. You can inquire."

The prosecutor then asked Kruse whether he was investigated for murder in 2018. Kruse denied that he was. Defense counsel objected that the question was outside the scope of redirect. The court disagreed and overruled the objection. After the prosecutor asked a couple more questions that indicated Kruse had been investigated for a homicide relating to a former girlfriend in 2018, she asked, "And you were in fact investigated for killing your ex-girlfriend's baby; is that correct?" Kruse answered, "Incorrect, miss[,]" and his counsel objected, stating, "Motion in limines. Facts not in evidence. Outside the scope of redirect." The court overruled the objection "on all grounds."

The prosecutor then asked, "And Detective Mayfield tried to contact your girlfriend back in 2018 regarding the baby that – your girlfriend's baby died, correct?" Kruse answered, "At that time, no, miss." The prosecutor next asked, "So is it your testimony today that you were never investigated for a baby homicide?" Kruse replied. "It is my testimony today, yes, that I was never investigated in 2018 for a baby homicide, miss." The prosecutor asked, "Either in 2018 or 2019?" Kruse responded, "Never, miss."

On redirect, Kruse's counsel asked Kruse if there was anything he wanted to share about the "baby homicide" or his former girlfriend. Kruse got emotional as he explained that he met his former girlfriend the year before and got into a relationship with her. The girlfriend's son had a seizure and was going to undergo brain surgery when the police arrested Kruse and

15

the girlfriend for child cruelty and also arrested Kruse for identity theft. Kruse pled guilty to identity theft but was ultimately not charged with child cruelty. He said he was feeling emotional testifying about those events because the girlfriend's son passed away when he and the girlfriend were both in jail and he was still grappling with the loss.

When the court instructed the jury, it included the following instruction regarding Kruse's statements that he got six months for murder: "Now you heard evidence the defendant, Mr. Kruse, told some of the witnesses that he only got six months for murder. You are not to speculate about any other case not before you or whether such a case actually exists. You are only to consider this evidence for the limited purpose of determining whether any alleged threat made by the defendant actually caused Samantha Howell to be in sustained fear for her own safety and whether her fear was reasonable under the circumstances. You may consider that evidence only for that purpose and for no other."

After the court instructed the jury and before closing arguments, Kruse's counsel moved for a mistrial on the ground the jury was tainted when the prosecutor questioned Kruse "about a 2019 case involving the death of a child[.]" Counsel argued that she had not brought up a topic on redirect that opened the door to "that specific inquiry on recross." Counsel further argued that the trial was unfair to Kruse because "we've spent an ample amount of time on that particular investigation without the defense having an opportunity to have any police reports relating to the investigation[.]" The court denied the motion for a mistrial.

*Applicable principles*

"A trial court's decision to admit or exclude evidence is reviewable for abuse of discretion." (*People v. Viera* (2005) 35 Cal.4th 264, 292.) "[T]he trial

16

court has wide latitude under state law to exclude evidence offered for impeachment that is collateral and has no relevance to the action. [Citations.] This exercise of discretion necessarily encompasses a determination that the probative value of such evidence is 'substantially outweighed' by its prejudicial, 'confusing,' or time-consuming nature." (*People v. Contreras* (2013) 58 Cal.4th 123, 152.)

"Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional . . . test [set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836]: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*People v. Partida* (2005) 37 Cal.4th 428, 439.)

*Analysis*

We conclude that it was an abuse of discretion to overrule Kruse's objection to the prosecutor's reference to Kruse's being investigated for killing a baby after the court had twice ruled that any such reference to a "baby" or "child" must be excluded because, in the court's words, it "could be overly prejudicial." Kruse's inaccurate testimony on redirect examination that his statement to the police about getting six months for murder related to the 2013 case involving the flash bang grenade and not a later 2018 case may have opened the door for the prosecutor to ask questions about a 2018 or 2019 murder investigation, but it did not open the door to ignore the court's ruling that any reference to killing a child or baby must be excluded from the jury.[2]

---

[2] In fairness to the prosecutor, she asked to address the matter in a sidebar conference with the court and defense counsel before she asked about the investigation regarding the death of Kruse's girlfriend's baby, but the court declined, deeming the sidebar to be unnecessary. It is not clear whether the court understood that the prosecutor intended to refer to the death or "killing" of a baby as opposed to simply referring to a homicide investigation without specifying a victim.

17

We agree with Kruse that nothing had changed that would lead the prosecutor and court to reasonably conclude that although the court had twice prohibited references to Kruse's statement about getting six months for murdering "a child," it was permissible in the prosecutor's impeachment cross-examination to refer to Kruse's having been investigated for killing his former girlfriend's baby. The prosecutor could have elicited testimony from Kruse that his statement about getting six months for a murder related to a 2018 homicide investigation and not the 2013 case without referring to the death of a baby.[3]

---

[3] The People note that Kruse argues the trial court failed to conduct an Evidence Code section 352 analysis in allowing the prosecutor to ask him whether he had ever been investigated for killing his girlfriend's baby. The People argue that defense counsel did not object under section 352 in the trial court. However, as the People acknowledge, one of the grounds defense counsel asserted for her objection was that the prosecutor's questions about a baby being killed violated motions in limine. It is reasonable to assume that in the heat of the moment, defense counsel's reference to motions in limine included the court's earlier rulings that evidence of Kruse's statements about getting six months for murder could be presented to the jury, but without any reference to killing a child because such reference "could be overly prejudicial." Defense counsel expressly cited section 352 in arguing to the court that Kruse's statement about killing a child should be excluded on the grounds it was irrelevant as to Armenta, highly prejudicial because it would inflame the jury, and cumulative to Howell's testimony about Kruse's statements about a murder. Later, just before the prosecutor showed the jury the body-worn camera video in which Kruse made the statement about getting six months for murder, defense counsel objected on the grounds of "relevance and undue consumption of time." The court understood counsel's objection to be under Evidence Code section 352, responding, "All right. Your 352 objection [is] overruled." Thus, it is inaccurate to say that defense counsel did not object under Evidence Code section 352.

However, on this record, we conclude that the court's allowance of the prosecutor's questions about an investigation into the homicide of a baby was not prejudicial–i.e., it is not reasonably probable that Kruse would have obtained a more favorable verdict but for the prosecutor's questions indicating that Kruse had been investigated for killing his former girlfriend's baby. Preliminarily, we note that apart from the prosecutor's questions, no evidence of a homicide investigation was presented to the jury. Kruse's denial on cross-examination that he had ever been investigated for a baby homicide left the jury with only the implication from the prosecutor's questions that there had been such an investigation. The prosecutor did not present evidence that Kruse was investigated for a child homicide and Kruse did not mention an investigation in the police video; he mentioned a "murder, which [he] got six months for." Nor did Kruse's explanation of the 2018 case on redirect disclose a murder investigation; it disclosed only that he was arrested for, but not charged with, child cruelty and that he pled guilty to identity theft. If the court had sustained Kruse's objection to the baby killing questions and instructed the jury to disregard them, the jury would not have heard Kruse's unchallenged explanation of the 2018 case. It is unlikely that the prosecutor's questions about the case followed by Kruse's explanation of what happened affected the jury's determination of whether Kruse was guilty of the charges against him.

The jury obviously found Howell credible and presumably found Kruse guilty of the criminal threat count based on her testimony that he made the threat and that she feared Kruse because, among other reasons, she heard him say in Koetter's apartment that he was involved in a murder case. Howell's testimony that Kruse criminally threatened her was corroborated by Foster's testimony that when Howell came downstairs from the apartment

19

and the 911 call was made, she told Foster that Kruse had just threatened to kill her, and by Koetter's testimony that Howell told her about the threat three days after the incident. Howell's testimony that Kruse referred to being involved in a murder case was corroborated by the police video showing Kruse saying to Howell, "[I] have a murder case and everything and I'm getting let go."

Although evidence of Kruse's statement to the police about getting six months for a murder and the prosecutor's questions regarding a 2018 investigation into the death of his girlfriend's baby may have negatively affected the jury's assessment of Kruse's character, neither was likely to have affected the jury's determination of whether Howell was reasonably in fear of Kruse as a result of his threat because there was no evidence that Howell was present when Kruse made the statement to the police or that she was aware of the statement or the 2018 case involving the death of a child. The court instructed the jury to consider evidence that Kruse said he got six months for murder only "for the limited purpose of determining whether any alleged threat made by the defendant actually caused Samantha Howell to be in sustained fear for her own safety and whether her fear was reasonable under the circumstances." Because there was no evidence that Howell heard Kruse make the statement about getting six months for a murder or knew anything about the case he was referring to, it is unlikely that the jury gave either much weight in considering whether Howell was reasonably in sustained fear as a result of Kruse's threat to kill her. Evidence of a statement that Howell did not hear and a case she was unaware of had little, if any, relevance to her state of mind.

Further, we conclude it is not reasonably probable that but for the prosecutor's questions about a baby homicide investigation, the jury would

20

have believed Kruse's testimony over Howell's on the question of whether Kruse threatened Howell, or would have believed Kruse's characterizations of his statements to officers in the sallyport and holding cell over the testimony of Armenta regarding Kruse's threats. The jury likely found Howell more credible than Kruse based on evidence that Kruse had a substantial criminal history and associated with other people with criminal history in contrast to Howell's testimony that she was a kindergarten teacher. Kruse's testimony that he never threatened Howell was inconsistent with the police body camera video in which Howell spontaneously said to Kruse, "You're the one who threatened to put a bullet in my brain . . . . You're the one who threatened us." It simply is not reasonably probable that the prosecutor's baby-killing questions affected the jurors' assessment of Kruse's credibility to the point where they would have believed Kruse's testimony but for that questioning.

The police body-worn camera videos of Kruse at the police station presented strong evidence of Kruse's guilt of the section 69 count and likely were key to the jury's assessment of his credibility with respect to his denial that he committed any of the charged offenses. The videos impeached Kruse's credibility by reflecting that he threatened officers, contrary to his trial testimony that he had not done so. The jury's decision to believe Howell's and Armenta's testimony over Kruse's testimony would not likely have been different if the prosecutor had not questioned Kruse about a baby-homicide investigation or the court had sustained Kruse's objection to that questioning. Accordingly, we conclude that the court's error in allowing the prosecutor to question Kruse about having been investigated for killing his girlfriend's child was not prejudicial because it is not reasonably probable that Kruse would have obtained a more favorable verdict but for the error.

21

II. *Section 148, Subdivision (a)(1) as a Lesser Included Offense of Section 69*

Kruse contends that the court prejudicially erred in refusing to instruct the jury on section 148, subdivision (a)(1) (hereafter section 148(a)(1)) as a lesser included offense of section 69. We conclude the court was not required to give the requested lesser included offense instruction under the circumstances of this case. As we will explain, section 69 can be violated in two different ways, and section 148(a)(1) is a lesser included offense of one way of violating section 69, but is not a lesser included offense of the other way. Because the jury was instructed only on the way of violating section 69 that does not necessarily include a violation of section 148(a)(1), the court was not required to instruct on section 148(a)(1) as a lesser included offense of section 69.

*Background*

Section 69, subdivision (a) provides: "Every person who attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon the officer by law, or who knowingly resists, by the use of force or violence, the officer, in the performance of his or her duty, is punishable by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment pursuant to subdivision (h) of Section 1170, or in a county jail not exceeding one year, or by both such fine and imprisonment."

The court instructed the jury on the section 69 count as follows: "The defendant is charged in Count 2 with trying to deter an executive officer from performing that officer's duty in violation of Penal Code Section 69. This is CALCRIM 2651. To prove the defendant is guilty of this crime, the People have to prove three elements. No. 1, the defendant willfully and unlawfully used violence or threats of violence to try and prevent or deter an executive

22

officer from performing an officer's lawful duty; Two, when the defendant acted, he intended to prevent or deter the executive officer from performing the officer's lawful duty; [a]nd [T]hree, when the defendant acted, he knew the person was an executive officer."

When counsel and the court were discussing jury instructions, Kruse's counsel requested an instruction on section 148(a)(1) as a lesser included offense of section 69. Section 148(a)(1) provides: "Every person who willfully resists, delays, or obstructs any public officer, peace officer, or an emergency medical technician . . . in the discharge or attempt to discharge any duty of his or her office or employment, when no other punishment is prescribed, shall be punished by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment."

The court denied the request to instruct on section 148(a)(1) based on *People v. Smith* (2013) 57 Cal.4th 232 (*Smith*). The court stated that the California Supreme Court in *Smith* held that the offense described in section 148 is not a lesser included offense of section 69. Defense counsel then asked the court to instruct on section 148 as a lesser *related* offense of section 69, and the court denied that request. Although the trial court's view of the holding in *Smith* was not entirely correct, we conclude the court correctly concluded that it was not required to instruct the jury on section 148(a)(1) as a lesser included offense of section 69.

*Smith*

The *Smith* court addressed the specific issue of whether section 148(a)(1), is a lesser included offense of section 69. Regarding the trial court's general duty to instruct on a lesser included offense, *Smith* noted: " 'It is settled that in criminal cases, even in the absence of a request, the trial

court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case. [Citations.]' [Citation.] 'That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged.' " (*Smith, supra,* 57 Cal.4th at p. 239.)

" 'California law has long provided that even absent a request, and over any party's objection, a trial court must instruct a criminal jury on any lesser offense "necessarily included" in the charged offense, if there is substantial evidence that only the lesser crime was committed. . . . Thus, 'a trial court errs if it fails to instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence. On the other hand, the court is not obliged to instruct on theories that have no such evidentiary support.' [Citation.]

"For purposes of determining a trial court's instructional duties . . . 'a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser.' " (*Smith, supra,* 57 Cal.4th at pp. 239-240.)

The *Smith* court observed that "[s]ection 148(a)(1) is not a lesser included offense of section 69 based on the statutory elements of each crime." (*Smith, supra,* 57 Cal.4th at p. 240.) *Smith* "explained that section 69 'sets forth two separate ways in which an offense can be committed. The first is

24

attempting by threats or violence to deter or prevent an officer from performing a duty imposed by law; the second is resisting by force or violence an officer in the performance of his or her duty.' [Citation.]

"The first way of violating section 69 'encompasses attempts to deter either an officer's immediate performance of a duty imposed by law or the officer's performance of such a duty at some time in the future.' [Citation.] The actual use of force or violence is not required. [Citation.] Further, 'the statutory language [of the first clause of section 69] does not require that the officer be engaged in the performance of his or her duties at the time the threat is made. . . . Thus, for example, a person who telephones an off-duty officer at his or her home and threatens to kill the officer if he or she continues to pursue a lawful investigation the following day or week may be convicted of the first type of offense under section 69, even though the officer was not engaged in the performance of his or her duties at the time the threat was made.' [Citation.]

"The second way of violating section 69 expressly requires that the defendant resist the officer 'by the use of force or violence,' and it further requires that the officer was acting lawfully at the time of the offense. [Citation.] [¶] Section 148(a)(1) is similar to the second way of violating section 69 but is clearly different from the first way of violating section 69. Section 148(a)(1) says: 'Every person who willfully resists, delays, or obstructs any public officer, peace officer, or an emergency medical technician . . . in the discharge or attempt to discharge any duty of his or her office or employment, when no other punishment is prescribed, shall be punished by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment.'

"A person who violates section 69 in the second way—by 'knowingly resist[ing], by the use of force or violence, such officer, in the performance of his duty'—also necessarily violates section 148(a)(1) by 'willfully resist[ing] . . . any public officer . . . in the discharge or attempt to discharge any duty of his or her office or employment.' [Citation.] But it is possible to violate section 69 in the first way—by attempting, through threat or violence, to deter or prevent an executive officer from performing a duty—without also violating section 148(a)(1). A person who threatens an executive officer in an attempt to deter the officer from performing a duty 'at some time in the future' [citation] does not necessarily willfully resist that officer in the discharge or attempt to discharge his or her duty under section 148(a)(1). Accordingly, section 148(a)(1) is not a lesser included offense of section 69 based on the statutory elements of each offense." (*Smith, supra,* 57 Cal.4th at pp. 240-241.)

However, the *Smith* court noted that in determining whether there is a duty to instruct the jury on a lesser included offense, courts "also consider the language of the accusatory pleading." (*Smith, supra,* 57 Cal.4th at p. 242.) *Smith* observed that "[i]f the accusatory pleading in [the present] case had charged only the first way of violating section 69—i.e., that defendant attempted, through threat or violence, to deter or prevent an executive officer from performing a duty—section 148(a)(1) would not have been a necessarily included offense." However, the amended information "alleged in both counts that defendant violated section 69 not only in the first way but also in the second way by forcibly resisting an officer." (*Smith,* at pp. 242-243.) Because it is not possible to violate section 69 in the second way without also violating section 148(a), "section 148(a)(1) was a necessarily included lesser offense of section 69 as alleged in the amended information." (*Smith*, at p. 243.)

26

The *Smith* court concluded: "The prosecution may, of course, choose to file an accusatory pleading that does not allege the commission of a greater offense in a way that necessarily subsumes a lesser offense. But so long as the prosecution has chosen to allege a way of committing the greater offense that necessarily subsumes a lesser offense, and so long as there is substantial evidence that the defendant committed the lesser offense without also committing the greater, the trial court must instruct on the lesser included offense." (*Smith, supra,* 57 Cal.4th at p. 244.)

The *Smith* court "summarize[d] the trial court's instructional duty as follows: Where an accusatory pleading alleges both ways of violating section 69, the trial court should instruct the jury that if it finds beyond a reasonable doubt that a defendant committed either way of violating section 69, it should find the defendant guilty of that crime. If not, the jury may return a verdict on the lesser offense of section 148(a)(1) so long as there is substantial evidence to conclude that the defendant violated section 148(a)(1) without also violating section 69." (*Smith, supra,* 57 Cal.4th at pp. 244-245.)

Kruse contends that under *Smith*, the trial court was required to instruct on section 148(a)(1) as a lesser included offense of section 69 because the accusatory pleading in this case charged him with both ways of violating section 69. We do not read *Smith* as requiring the trial court in the present case to instruct the jury on section 148(a)(1) as a lesser included offense of section 69. In *Smith,* the prosecution not only alleged both ways of violating section 69 in the accusatory pleading, at trial the court instructed the jury on both ways of violating section 69. (*Smith, supra,* 57 Cal.4th at p. 238.) Here, the court instructed the jury only on the first way of violating section 69 because the prosecution chose to pursue a conviction only under the first way at trial. When the parties and the court were going over jury instructions,

27

the prosecutor requested CALCRIM No. 2651, which instructs on the first way to violate section 69; the prosecutor did not ask for CALCRIM No. 2652, which instructs on the second way to violate the statute. The prosecutor submitted a proposed instruction that referenced CALCRIM No. 2652 and the prosecutor stated she wanted to change it to CALCRIM No. 2651. Defense counsel informed the court that she was satisfied with that change.

*Smith* did not consider whether the court must instruct on section 148(a)(1) as a lesser included offense where, as here, the jury is instructed only on the way of committing section 69 that does not necessarily include the lesser offense under section 148(a)(1). The *Smith* court observed that "[w]here an accusatory pleading alleges both ways of violating section 69, *the trial court should instruct the jury that if it finds beyond a reasonable doubt that a defendant committed either way of violating section 69, it should find the defendant guilty of that crime.*" (*Smith, supra,* at pp. 244-245, italics added.)

The italicized language shows that *Smith*'s holding is based on the assumption that where an accusatory pleading alleges both ways of violating section 69, the jury will be instructed on both ways at trial, which in turn is based on the assumption that the prosecution at trial will attempt to prove the defendant violated the statute in both ways. *Smith* did not address the propriety of giving a lesser included offense instruction where the prosecution elects to pursue only one of two ways of committing an offense at trial, the jury is instructed only on that way, and that way does not necessarily include a lesser offense. "[I]t is axiomatic that cases are not authority for propositions not considered." (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1176.)

Instructing on only one way of violating section 69 is effectively the same as pleading only one way; the other way of violating the statute is simply not at issue at trial. Thus, the prosecutor's election in the present case to pursue a conviction of only the first way of violating section 69 was, in effect, an amendment of the accusatory pleading. Because the prosecutor's election effectively amended the charges to eliminate the second way of violating section 69 and the jury was not instructed on the second way of violating section 69, the trial court properly denied Kruse's request for an instruction on section 148(a)(1) as a lesser included offense of section 69. There was no reason for the trial court to instruct on a lesser included offense that is not necessarily included in the only way of violating section 69 that the prosecution sought to prove at trial and as to which the court instructed the jury.

There is language in *Smith* that suggests the court's analysis would have been different if the jury in *Smith* had not been instructed on both ways of violating section 69. As noted, the *Smith* court observed that if the accusatory pleading in that case "had charged only the first way of violating section 69—i.e., that defendant attempted, through threat or violence, to deter or prevent an executive officer from performing a duty—section 148(a)(1) would not have been a necessarily included offense." (*Smith, supra,* 57 Cal.4th at p. 242.) The same analysis logically applies when the prosecution pursues a conviction and requests jury instructions only on the first way of violating section 69.

The *Smith* court reiterated that "[t]he prosecution may, of course, choose to file an accusatory pleading that does not allege the commission of a greater offense in a way that necessarily subsumes a lesser offense." (*Smith, supra,* 57 Cal.4th at p. 244.) Likewise, the prosecution may choose to only

29

pursue a conviction for commission of the greater offense in a way that does not necessarily include a lesser offense and, at the prosecution's request, the court may instruct the jury only on that way of committing the greater offense.  Under the reasoning of *Smith*, only where the prosecution has both chosen to allege a way of committing the greater offense that necessarily subsumes a lesser offense and pursues a conviction of that way of committing the greater offense at trial should the trial court be required to instruct on the lesser included offense, where there is substantial evidence that the defendant committed the lesser offense without also committing the greater.  The prosecution's choice to only seek a conviction of the first way of violating section 69 and to request a jury instruction only on that way is functionally equivalent to choosing "to file an accusatory pleading that does not allege the commission of a greater offense in a way that necessarily subsumes a lesser offense." (*Smith, supra,* 57 Cal.4th at p. 244.)

Although we have not found a published California case that directly addresses the issue of whether a trial court must instruct on section 148(a)(1) as a lesser included offense of section 69 when the jury is instructed only on the first way of violating section 69, the issue was addressed in a federal case. In *Lewis v. Arnold* (C.D. Cal., Oct. 17, 2019, No. CV 16-5714-CAS (JEM)) 2019 WL 6188624 (*Lewis*), the defendant was convicted of a violation of section 69 and other crimes and filed a petition for writ of habeas corpus in federal court. (*Lewis,* at p. *1)[4]  Among other claims, defendant contended his due process rights were violated when the trial court refused to instruct the jury regarding the lesser included offense of misdemeanor resisting an officer in violation of section 148(a)(1). (*Lewis,* at pp. *4, *12.) Although the

---

[4]    The specified page numbers for *Lewis* are Westlaw page numbers.

30

accusatory pleading alleged both ways of violating section 69, as in the present case, the prosecutor during the jury instruction conference at trial requested only CALCRIM No. 2651, which sets forth the first way of violating section 69, and did not ask for CALCRIM No. 2652, which sets forth the second way of violating section 69. Defense counsel requested a jury instruction on section 148(a)(1) as a lesser included offense of section 69, and the trial court denied the request on the ground that a violation of section 148(a)(1) was not a lesser included offense. (*Lewis*, at p. \*12.)

The *Lewis* court concluded the defendant's claim failed on the merits in part because section 148(a)(1) "was not a lesser included offense of the charged Section 69 offense under the theory pursued at trial. Although the information alleged both ways of violating Section 69 and was never amended . . . , *the prosecutor submitted and the jury received only an instruction regarding the first way of violating Section 69. . . . Misdemeanor resisting under Section 148 is not a lesser included offense of the first way of violating Section 69. [Citation.] It [is a] lesser included offense of the second way, . . . but [defendant's] jury was never instructed regarding the second way*." (*Lewis, supra*, 2019 WL 6188624, at p. \*13, italics added.)[5]

In sum, we conclude that the rationale for a lesser included offense instruction does not apply when the lesser offense is not necessarily included in the only theory of the greater offense pursued by the prosecution and instructed to the jury at trial. When a lesser included offense instruction is

_____

[5] The *Lewis* court noted that on direct appeal the Court of Appeal (in a nonpublished opinion) found that "although the information alleged both ways of violating Section 69, 'the prosecutor effectively abandoned that approach when he requested submission of only CALCRIM No. 2651.' " (*Lewis, supra*, 2019 WL 6188624, at p. \*12.)

required under only one of two ways of violating a penal statute alleged in the accusatory pleading and the jury is instructed only on the way of violating the statute that does not require a lesser included offense instruction, the accusatory pleading should not control the trial court's determination of whether a lesser included offense instruction is required.  In the present case, because the prosecution elected to seek to convict Kruse of violating only the first way of violating section 69 and the jury was instructed only on that way, and was not instructed on the second way of violating section 69, the trial court properly denied Kruse's request to instruct on section 148(a)(1) as a lesser included offense of section 69.

## DISPOSITION

The judgment is affirmed.

BENKE, Acting P. J.

WE CONCUR:

DATO, J.

GUERRERO, J.

32